IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CONSUMER CELLULAR, INCORPORATED,

      Plaintiff,

                                    3:15-CV-1908-PK

v.                                 FINDINGS AND
                                 RECOMMENDATION

CONSUMERAFFAIRS.COM, CONSUMERS
UNIFIED, LLC, and DAVID ZACHARY CARMAN,

      Defendants.

PAPAK, Magistrate Judge:

      Plaintiff Consumer Cellular, Inc. ("CCI"), filed this action against defendants

ConsumerAffairs.com. Inc. ("ConsumerAffairs"), Consumers Unified, LLC ("Consumers

Unified"), and David Zachary Carman in the Multnomah County Circuit Court on August 19,

2015. Defendants removed CCI's action to this court effective October 9, 2015, on the basis of

both diversity and federal question jurisdiction.

      CCI is a mobile virtual network operator providing cellphone service to its customers.

ConsumerAffairs operates a consumer review website hosting consumer reviews regarding a

Page 1 - FINDINGS AND RECOMMENDATION

large number of products and brands. Consumers Unified is a closely related affiliate of ConsumerAffairs, and Carman is the principal of both corporate defendants. By and through its complaint as filed in the Multnomah County court, CCI alleges that defendants improperly manipulated the content and presentation of consumer reviews on the ConsumerAffairs website in order to provide a significant competitive advantage to product manufacturers and service providers who pay a large monthly fee to defendants, relative to manufacturers and providers who decline to pay such fees. Arising out of the foregoing, CCI alleges defendants' liability (i) for violation of Oregon's Unlawful Trade Practices Act (the "UTPA"), (ii) for intentional interference with prospective economic relations under Oregon common law, (iii) for conduct of or participation in an enterprise engaged in wire fraud and extortion in violation of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), and (iv) for defamation under Oregon common law. CCI seeks monetary damages in the approximate amount of $5 million, equitable relief under the UTPA, treble damages under RICO, and award of its fees and costs. This court has federal-question jurisdiction over CCI's RICO claim pursuant to 28 U.S.C. § 1331 and may properly exercise supplemental jurisdiction over CCI's state-law claims pursuant to 28 U.S.C. § 1367; in addition, it is possible[1] that the court may properly exercise diversity jurisdiction over CCI's action pursuant to 28 U.S.C. § 1332(a) based on the (apparent) complete diversity of the parties and the amount in controversy.

Now before the court is defendants' special motion (#9) to strike, brought under Or Rev.

---

[1] Defendants have filed a Corporate Disclosure Statement on behalf of Consumers Unified (a limited liability corporation), by and through which they assert that Consumers Unified is a citizen of "Delaware, Virginia, Florida, New Mexico, Massachusetts, Colorado, California, Nevada, and Oklahoma." Defendants do not otherwise disclose the identities or citizenship of the members of Consumers United.

Stat. 31.150 (Oregon's "anti-SLAPP" statute), by and through which defendants seek an order

striking all of CCI's claims against them or, in the alternative, an order striking CCI's claims

against Carman or, in the further alternative, an order dismissing CCI's RICO claim for failure to

state a claim upon which relief can be granted. I have considered the motion, oral argument on

behalf of the parties, and all of the pleadings and papers on file. For the reasons set forth below,

defendants' motion should be denied in its entirety.

**LEGAL STANDARD**

**I.      Special Motion to Strike**

"Or. Rev. Stat. §§ 31.150 - 31.155 comprise Oregon's anti-SLAPP ("Strategic Lawsuit

Against Public Participation") statute[]. Anti-SLAPP statutes are designed to allow the early

dismissal of meritless lawsuits aimed at chilling expression through costly, time-consuming

litigation." *In re Gardner*, 563 F.3d 981, 986 (9th Cir. 2009), *citing Verizon Delaware, Inc. v.*

*Covad Comms. Co.*, 377 F.3d 1081, 1090 (9th Cir. 2004).

> Section 31.150 allows defendants to bring a special motion to strike a claim which
> shall be treated as a motion to dismiss under Or. R. Civ. P. 21 A and requires the
> court to enter a "judgment of dismissal without prejudice" if the motion is granted.
> **The court's consideration of a special motion to strike is a two-step process.**
> **First, the defendant has the initial burden to show that the challenged**
> **statement is within one of the categories of civil actions described in Or. Rev.**
> **Stat. § 31.150(2). If the defendant meets the initial burden, "the burden**
> **shifts to the plaintiff in the action to establish that there is a probability that**
> **the plaintiff will prevail on the claim by presenting substantial evidence to**
> **support a prima facie case.** If the plaintiff meets this burden, the court shall
> deny the motion." Or. Rev. Stat. § 31.150(3).

*In re Gardner*, 563 F.3d at 986 (emphasis supplied; footnote omitted).

In evaluating special motions to strike under Section 31.150, the Oregon courts consider

"the facts underlying plaintiffs' claims in the light most favorable to plaintiffs," *Neumann v. Liles*,

Page 3 - FINDINGS AND RECOMMENDATION

261 Or. App. 567, 570 n. 2 (2014), and do not weigh the evidence or make any determination of the likelihood that plaintiffs will ultimately prevail, *citing Young v. Davis*, 259 Or. App. 497, 508 (2013). Each of the two steps of the process — the defendant's burden to show that the challenged statement is within the scope of the anti-SLAPP statute and the plaintiff's burden to establish "a probability" that the claims will prevail "by presenting substantial evidence to support a *prima facie* case" – presents a question of law. *Id.* at 572, *citing Young*, 259 Or. App. at 507-510. Section 31.150 is intended to create and does create a "low bar" for plaintiffs to overcome, and is intended only "to weed out meritless claims meant to harass or intimidate—not to require that a plaintiff prove its case before being allowed to proceed further." *Young*, 259 Or. App. at 508, *citing Staten v. Steel*, 222 Or. App. 17, 32 (2008) ("The purpose of the special motion to strike procedure. . . is to expeditiously terminate *unfounded* claims that threaten constitutional free speech rights, not to deprive litigants of the benefit of a jury determination that a claim is *meritorious*" (emphasis original)). A plaintiff meets its burden under Section 31.150 by submitting evidence that, if credited, "would permit a reasonable factfinder" to rule in the plaintiff's favor. *Neumann*, 261 Or. App. at 575; *see also Young*, 259 Or. App. at 508 ("the presentation of substantial evidence to support a *prima facie* case is, *in and of itself*, sufficient to establish a probability that the plaintiff will prevail; whether or not it is 'likely' that the plaintiff will prevail is irrelevant in determining whether it has met the burden of proof set forth by ORS 31.150(3)" (emphasis original)). As necessarily follows from the foregoing, the fact that the defendant may present substantial evidence to the contrary is likewise irrelevant to determining whether the plaintiff has met his burden. *See Young*, 259 Or. App. at 510.

The Oregon courts "look to California case law [in construing Section 31.150 *et seq.*]

Page 4 - FINDINGS AND RECOMMENDATION

because Oregon's anti-SLAPP statute was 'modeled on California statutes' and '[i]t was intended that California case law would inform Oregon courts regarding the application of ORS 31.150 to ORS 31.155.'" *Neumann*, 2014 Ore. App. LEXIS 296, *9 n. 3, *quoting Page v. Parsons*, 249 Or. App. 445, 461 (2012).

## II.     Motion to Dismiss for Failure to State a Claim

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint must contain more than a "formulaic recitation of the elements of a cause of action;" specifically, it must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To raise a right to relief above the speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.*, *quoting* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R. Civ. P. 8(a).  Instead, the plaintiff must plead affirmative factual content, as opposed to any merely conclusory recitation that the elements of a claim have been satisfied, that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *citing Twombly*, 550 U.S. at 556.  "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009), *citing Iqbal*, 556 U.S. at 678.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial

notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). In considering a motion to dismiss, this court accepts all of the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007). Moreover, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court need not, however, accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

**MATERIAL FACTS**

I.      **The Parties**

Plaintiff CCI is a mobile virtual network operator providing cellphone service to its customers. CCI is headquartered in Oregon and organized under Oregon law.

Defendant ConsumerAffairs operates a website hosting consumer reviews of a variety of products, brands, and services. ConsumerAffairs is organized under Nevada law and appears to be headquartered in Oklahoma. Defendant Consumers Unified is a closely related affiliate of ConsumerAffairs, is organized under Nevada law, and apparently has members who are citizens of California, Colorado, Delaware, Florida, Massachusetts, Nevada, New Mexico, Oklahoma, and Virginia. Defendant Carman is the principal of both corporate defendants, and is a citizen of Oklahoma.

## II.    History Underlying the Parties' Dispute[2]

ConsumerAffairs has been in existence since 1998.  Carman acquired ConsumerAffairs in 2010, at which time he modified its business model in order to earn increased revenue by inducing manufacturers and providers whose products and services were reviewed on the ConsumerAffairs website to pay fees to become accredited members entitled to preferential treatment in the display and use of consumer ratings.  Specifically, (i) ConsumerAffairs conspicuously characterizes customer reviews of the products and services offered by paying accredited members as "Reviews and Complaints" whereas it equally conspicuously characterizes the reviews of other entities' products and services as "Complaints and Reviews," (ii) Consumer-Affairs permits accredited members to challenge or otherwise respond to negative reviews, eliminating such reviews where members assert that the complaints are not based in fact or where the consumer who originally posted the negative review fails to rebut the members' response, whereas other entities are not given any opportunity to challenge or respond to negative reviews, (iii) the pages dedicated to reviews of non-accredited members' products and services all include a section containing the text "Not Impressed With [the entity whose products or services are under review]?  Find a company you can trust," followed by a link to "Top Alternatives" headed by an accredited member, whereas the pages dedicated to reviews of accredited members contain no such sections, and (iv) reviews are presented in reverse chronological order on the pages dedicated to review of non-accredited members' products and services, whereas positive reviews are moved to the top of the display of reviews of accredited members' products and services.

---

[2] Except where otherwise indicated, the following recitation constitutes my construal of the parties' evidentiary proffers in the light most favorable to CCI.

On August 19, 2014, Andrew Polacek, a sales executive at ConsumerAffairs, began a series of email solicitations directed to Brian Hepner, a marketing executive at CCI. Polacek's first email message indicated that the ConsumerAffairs page dedicated to hosting reviews of CCI's products had been viewed 14,000 times during the previous 30 days, and that the page hosted "149 reviews and complaints that have not been addressed by [CCI]," with the stated consequence that CCI's "brand [wa]s currently being defined on the page by detractors in a highly visible way." Polacek offered to help CCI "turn[] the page positive and transform[] it into a positive branding message." Hepner did not respond to Polacek's initial message.

Polacek sent Hepner further similar messages on September 2 and September 9, 2014. On September 12, 2014, CCI digital marketing manager Dominic Artero agreed to speak with Polacek on September 16, 2014.

On September 16, 2014, Polacek explained to Artero that ConsumerAffairs could erase or raise negative ratings by permitting CCI to challenge or otherwise respond to such ratings, and could additionally affirmatively solicit positive reviews of CCI's services.

On October 7, 2014, Polacek emailed Artero to assert that the ConsumerAffairs page dedicated to reviews of CCI had been viewed more that 18,000 times in the previous 30 days. On October 10, 2014, Polacek emailed Artero a PowerPoint presentation advising that Google searches for "Consumer Cellular" or for "Consumer Cellular reviews" yielded ConsumerAffairs' CCI page as either the third or fourth result, and that the page currently rated CCI overall with two out of five possible stars. The presentation indicated that the 2/5 rating could be increased to a "strong positive" in exchange for a $15,000 "setup" fee and a recurring $5,000 monthly fee thereafter. The presentation indicated that such a change could immediately yield "$7,200 a

Page 8 - FINDINGS AND RECOMMENDATION

month in customer lifetime revenue" and that "once we've turned the pages around to being net positive" that amount could be expected to increase by a factor of ten. The presentation indicated that these numbers were based on "a low [then-current estimated] conversion rate [*i.e.*, the percentage of customers viewing reviews who ultimately enter into a business relationship with the entity whose services are being reviewed] . . . [of] 2%,"[3] and the presumption that the "conversion rates of leads and sales are typically much higher than that once [defendants had] turned the pages around to being net positive [*i.e.*, after the entity at issue became an accredited member] (more like 10% and 20%, respectively)."

In or around late October or early November 2014, CCI CEO John Marick declined to do business with defendants. On November 18, 2014, Polacek emailed Marick directly, inquiring as to why Marick would decline an arrangement that would "pay for . . . itself and then some" from its inception. Polacek included as attachments to his message computer screenshots indicating that the ConsumerAffairs CCI page had been viewed nearly 24,000 times in the previous 30 days, and that CCI had a then-shrinking 1.5/5 star rating.

In December 2014, ConsumerAffairs produced an article summarizing its hosted consumer reviews of CCI's services and linking to one extremely positive review. At approximately that same time, CCI received positive feedback from a CCI customer. CCI encouraged the customer to submit a review to ConsumerAffairs, and the customer replied that he had already submitted a positive review to that website. ConsumerAffairs did not post the

---

[3] CCI offers the declaration testimony of its President and CEO, John S. Marick, that between January 1, 2014, and July 15, 2015, members of the public who viewed CCI's website became CCI customers between approximately 1.7 and 2.3% of the time. *See* Declaration of John S. Marick, ¶ 9.

review. CCI believes that other, similarly situated customers submitted positive reviews to ConsumerAffairs following Marick's refusal to do business with the defendants that were not ultimately posted.

On February 18, 2015, Polacek emailed Hepner indicating that Google searches for "Consumer Cellular" then yielded ConsumerAffairs' CCI page as the second result and that Google searches for "Consumer Cellular reviews" yielded ConsumerAffairs' CCI page as the top result, that CCI had an overall rating of 1.5 stars on the ConsumerAffairs CCI page, and that the page had been viewed 22,000 times in the previous 30 days.

At some time thereafter, the link in the article of December 2014 was redirected from the positive review of CCI's services to the ConsumerAffairs CCI "Complaints and Reviews" page.

Between October 26, 2013, and April 15, 2014, defendants posted at least eight 5-star reviews of CCI's services that had been submitted by CCI customers. Between April 15 and August 19, 2014, defendants posted only one positive review of CCI's services, specifically a 4-star review. During the period when defendants were soliciting CCI's business, defendants posted two positive reviews of CCI's services, one a 5-star and one a 4-star review. Between October 1, 2014, and August 19, 2015, when this action was filed, defendants posted one single positive review of CCI's services (a 5-star review) and deleted from its website a formerly negative review that had been revised by the original reviewer to become a positive 5-star review. The largely negative reviews on the ConsumerAffairs CCI page are anomalous by comparison with reviews of CCI's services appearing on other sites, including those of the Better Business Bureau, Prepaid Reviews, CNET, Yelp, and Pissedconsumer.com.

ConsumerAffairs hosts reviews of 40 cellphone service providers, only one of which is an

Page 10 - FINDINGS AND RECOMMENDATION

accredited member. That accredited member has nearly a perfect 5-star rating on the

ConsumerAffairs website, whereas none of the other 39 providers whose services are reviewed

on ConsumerAffairs.com has as high as a 2-star rating. Prior to that entity becoming an

accredited member, it had virtually no positive reviews on the ConsumerAffairs website.

## ANALYSIS

### I.   **Defendants' Special Motion to Strike**

Oregon's Anti-SLAPP statute specifically provides as follows:

(1)    A defendant may make a special motion to strike against a claim in a civil
       action described in subsection (2) of this section. **The court shall grant
       the motion unless the plaintiff establishes in the manner provided by
       subsection (3) of this section that there is a probability that the
       plaintiff will prevail on the claim.** The special motion to strike shall be
       treated as a motion to dismiss under ORCP 21 A but shall not be subject to
       ORCP 21 F. Upon granting the special motion to strike, the court shall
       enter a judgment of dismissal without prejudice. If the court denies a
       special motion to strike, the court shall enter a limited judgment denying
       the motion.

(2)    **A special motion to strike may be made under this section against any
       claim in a civil action that arises out of:**

       (a)    Any oral statement made, or written statement or other document
              submitted, in a legislative, executive or judicial proceeding or other
              proceeding authorized by law;

       (b)    Any oral statement made, or written statement or other document
              submitted, in connection with an issue under consideration or
              review by a legislative, executive or judicial body or other
              proceeding authorized by law;

       (c)    **Any oral statement made, or written statement or other
              document presented, in a place open to the public or a public
              forum in connection with an issue of public interest; or**

       (d)    **Any other conduct in furtherance of the exercise of the
              constitutional right of petition or the constitutional right of**

> free speech in connection with a public issue or an issue of
> public interest.
>
> (3)  A defendant making a special motion to strike under the provisions of
> this section has the initial burden of making a prima facie showing
> that the claim against which the motion is made arises out of a
> statement, document or conduct described in subsection (2) of this
> section. If the defendant meets this burden, the burden shifts to the
> plaintiff in the action to establish that there is a probability that the
> plaintiff will prevail on the claim by presenting substantial evidence to
> support a prima facie case. If the plaintiff meets this burden, the court
> shall deny the motion.
>
> (4)  In making a determination under subsection (1) of this section, the
> court shall consider pleadings and supporting and opposing affidavits
> stating the facts upon which the liability or defense is based.
>
> (5)  If the court determines that the plaintiff has established a probability that
> the plaintiff will prevail on the claim:
>
>   (a)  The fact that the determination has been made and the substance of
>        the determination may not be admitted in evidence at any later
>        stage of the case; and
>
>   (b)  The determination does not affect the burden of proof or standard
>        of proof that is applied in the proceeding.

Or. Rev. Stat. 31.150 (emphasis supplied).[4]

CCI argues, first, that defendants' motion should be summarily denied because the anti-

SLAPP statute is a creature of state law (which it is), because the Federal Rules of Civil

Procedure do not provide any equivalent mechanism for early dismissal of meritless lawsuits

intended to chill the exercise of free speech rights (which they do not), and because the anti-

SLAPP statute is – purportedly – strictly procedural rather than substantive, and therefore outside

---

[4] Oregon Civil Procedure Rule 21 A provides a procedural mechanism for motions to dismiss, *see* Or. R. Civ. P. 21 A, while Oregon Civil Procedure Rule 21 F (which is expressly not applicable to motions brought under Section 31.150, *see* Or. Rev. Stat. 31.150(1)) permits motions to dismiss to be consolidated with other motions, *see* Or. R. Civ. P. 21 F.

Page 12 - FINDINGS AND RECOMMENDATION

the purview of the federal courts to enforce (*see, e.g.*, *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995) (federal courts sitting in diversity or exercising supplemental jurisdiction over state-law claims generally apply state substantive law and federal procedural law) (citations omitted)).   It is true that there is a significant procedural component to Oregon's anti-SLAPP statute, *see* Or. Rev. Stat. 31.155(2) ("ORS 31.150 and 31.152 create a procedure for seeking dismissal of claims described in ORS 31.150 (2) and do not affect the substantive law governing those claims"), but nothing in the statute or its legislative history suggests that the statute lacks any substantive component whatsoever.   Moreover, it is well established that, when sitting in diversity or exercising supplemental jurisdiction over state-law claims, "federal courts . . . must give full effect to state procedural rules when those rules are 'intimately bound up with the state's substantive decision making' or 'serve substantive state policies," *Cnty. of Orange v. United States Dist. Court*, 784 F.3d 520, 530 (9th Cir. 2015), *quoting Feldman v. Allstate Insurance Co.*, 322 F.3d 660 (9th Cir. 2003), and in any event the Ninth Circuit has repeatedly held that, in the absence of any conflict between federal procedural law and a state-enacted anti-SLAPP statute, such statutes should be applied and enforced in the federal courts, *see, e.g.*, *United States* ex rel. *Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972-973 (9th Cir. 1999), including Oregon's anti-SLAPP statute, *see Northon v. Rule*, 637 F.3d 937, 938-939 (9th Cir. 2011), *Englert v. MacDonell*, 551 F.3d 1099, 1101-1102 (9th Cir. 2009).   I therefore reject CCI's argument for summary denial of defendants' special motion to strike as contrary to applicable law.[5]

---

[5] Notwithstanding the foregoing, to the extent that Oregon's anti-SLAPP statute provides for an automatic stay of discovery when a special motion to strike is filed, because that provision would conflict with the Supreme Court's interpretation of Federal Civil Procedure Rule 56(f) as

In the alternative to its argument for wholesale summary denial of defendants' special motion, CCI argues as a preliminary matter that its RICO claim, as a cause of action arising under federal law, is necessarily outside the scope of Oregon'a anti-SLAPP statute. I agree with CCI that state anti-SLAPP statutes are as a matter of law necessarily inapplicable to federal causes of action. *See Hilton v. Hallmark Cards*, 599 F.3d 894, 901 (9th Cir. 2010). Defendants' special motion to strike should therefore be summarily denied (*qua* motion to strike) as to CCI's RICO cause of action. However, where, as here, the claimant has availed itself of the opportunity to submit briefing in support of the proposition that its at-issue claim is well pled, the courts of the Ninth Circuit may appropriately consider *sua sponte* whether such a claim is subject to dismissal under Federal Civil Procedure Rule 12(b)(6), *see Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335-336 (9th Cir. 2015), and this court may therefore appropriately construe defendants' motion as a Rule 12(b)(6) motion to dismiss to the extent it addresses CCI's RICO claim, *see LaHodny v. 48 Hours*, Case No. 6:13-CV-2102-TC, 2015 U.S. Dist. LEXIS 38447, *14 (D. Or. Feb. 17, 2015). I recommend that this court so construe defendants' special motion to strike as it applies to CCI's RICO claim, and I analyze the motion so construed below.

A.    **Defendants' Burden to Establish that CCI's State-Law Claims are within the Scope of the Anti-SLAPP Statute**

As noted above, CCI brings three state-law claims, one for violation of Oregon's UTPA, one for intentional interference with prospective economic relations under Oregon common law, and one for defamation under Oregon common law. As to CCI's first state-law claim, the UTPA

---

requiring discovery to proceed "where the nonmoving party has not had the opportunity to discover information that is essential to its opposition," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986), such automatic stay of discovery is necessarily inapplicable in federal court. *See Metabolife Int'l v. Wornick*, 264 F.3d 832, 846-847 (9th Cir. 2001).

Page 14 - FINDINGS AND RECOMMENDATION

provides that "a person that suffers an ascertainable loss of money or property, real or personal,

as a result of another person's willful use or employment of a method, act or practice declared

unlawful under ORS 646.608, may bring an individual action in an appropriate court to recover

actual damages or statutory damages of $200, whichever is greater." Or. Rev. Stat. 646.638(1).

Or. Rev. Stat. 646.608, in relevant part, provides that:

> A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:
>
> * * *
>
> (b)    Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.
>
> * * *
>
> (e)    Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have.
>
> * * *
>
> (h)    Disparages the real estate, goods, services, property or business of a customer or another by false or misleading representations of fact.

Or. Rev. Stat. 646.606(1). It is CCI's position that defendants violated the UTPA by curating and

presenting consumer reviews on its website in a manner calculated to cause a likelihood of

confusion regarding approval of its services and to disparage CCI's services misleadingly.

As to CCI's second state-law claim, under Oregon law:

> To state a claim for intentional interference with economic relations, a plaintiff must allege: (1) the existence of a professional or business relationship; (2)

intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relations; and (6) damages.

*Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498 (1999), *citing McGanty v. Staudenraus*, 321 Or. 532, 535 (1995). The requisite "professional or business relationship" may be purely prospective in nature. *See Cron v. Zimmer*, 255 Or. App. 114, 125 (2013), *quoting McGanty*, 321 Or. at 535. "Generally, commercial and contractual relationships enjoy the protection of the tort." *Id.*, *citing Allen v. Hall*, 328 Or. 276, 281 (1999). "However, a defendant can be liable for interference 'even though the arrangement interfered with does not rise to the dignity of a contract.'" *Id.*, *quoting Luisi v. Bank of Commerce*, 252 Or. 271, 275 (1969). "Liability for intentional interference with prospective business advantage. . . arises when the defendant, without a privilege to do so, induces a third person not to enter into or to continue a business relationship with the plaintiff." *Thompson v. Telephone & Data Sys.*, 130 Or. App. 302, 313 (1994); *citing Top Service Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 206 (1978). It is CCI's position that defendants intentionally interfered with its prospective business relationships with consumers affirmatively seeking reviews of its services on defendants' webpages by curating and presenting those reviews in a manner calculated to cause viewers to avoid doing business with CCI.

As to CCI's third state-law claim, under Oregon law, "[t]he elements of a claim for defamation are: (1) the making of a defamatory statement; (2) publication of the defamatory material; and (3) a resulting special harm, unless the statement is defamatory *per se* and therefore gives rise to presumptive special harm." *Nat'l Union Fire Ins. Co. v. Starplex Corp.*, 220 Or.

App. 560, 584 (2008), *citing L & D of Or. v. Am. States Ins. Co.*, 171 Or. App. 17, 22 (2000). "A defamatory statement is one that would subject another to hatred, contempt or ridicule or tend to diminish the esteem, respect, goodwill or confidence in which the other is held or to excite adverse, derogatory or unpleasant feelings or opinions against the other." *Id.* (internal modifications omitted), *quoting Marleau v. Truck Ins. Exch.*, 333 Or. 82, 94 (2001). It is CCI's position that its business was harmed by defendants' curation and presentation of reviews in a manner calculated to disparage CCI's services.

In light of the foregoing, defendants take the position that CCI's state-law claims arise out of one or both of the categories of cases listed under Or. Rev. Stat. 31.150(2)(c) and/or (d), namely:

(c)     Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or

(d)     Any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Or. Rev. Stat. 31.150(2). CCI counters that its state-law claims do not arise out of statements constituting expressions of free speech, but rather out of bad-faith removal or concealment of positive reviews and out of deceitful and manipulative nondisclosure of information material to interpretation of published expressions of free speech. That is, CCI characterizes the conduct out of which its claims arise as calculated to inhibit rather than to further constitutional free speech rights, and on that basis argues that its state-law claims are outside the scope of the anti-SLAPP statute.

Assuming *arguendo* that CCI is correct that the complained-of conduct cannot constitute

the making of a written statement or the presentation of a document, I find that all of the

complained-of conduct would nevertheless fall within the scope of Section 31.150(2)(d). First, it

appears clear that hosting a consumer reviews website accessible to the public constitutes a

public issue or issue of public interest for purposes of Oregon's anti-SLAPP statute. *See, e.g.,*

*Gardner v. Martino*, Case No. CV-05-769-HU, 2005 U.S. Dist. LEXIS 38970, *13-20 (D. Or.

Sept. 19, 2005) (so finding on the basis of collected material Oregon and California cases).

Second, there can be no serious argument that the expression of opinion regarding the quality of

services provided to the public is not conduct in furtherance of the exercise of the constitutional

right to free speech. Third, defendants' complained-of actions -- removing positive reviews,

increasing the salience of negative reviews, etc. – constitute elections made in the course of

editing, curating, and presenting the consumer reviews submitted to the ConsumerAffairs

website. As such, that conduct, too, is necessarily conduct in furtherance of the exercise of the

constitutional right to free speech for purposes of the anti-SLAPP statute. I therefore find that

defendants have met their burden to establish that CCI's state-law claims are within the scope of

Section 31.150(2). In consequence, the burden shifts to CCI to establish a probability of success

on the merits as to each of its state-law claims.

    **B.**    **CCI's Burden to Establish a Probability of Success on the Merits as to Each
of its State-Law Claims**

        **1.**    **CCI's Burden to Establish a Probability of Success on the Merits as to
its UTPA Claim**

As noted above, the UTPA provides that "a person that suffers an ascertainable loss of

money or property, real or personal, as a result of another person's willful use or employment of a

method, act or practice declared unlawful under ORS 646.608, may bring an individual action in

Page 18 - FINDINGS AND RECOMMENDATION

an appropriate court to recover actual damages or statutory damages of $200, whichever is greater." Or. Rev. Stat. 646.638(1). Or. Rev. Stat. 646.608, in relevant part, provides that:

> A person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:
>
> * * *
>
> (b)    Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services.
>
> * * *
>
> (e)    Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have.
>
> * * *
>
> (h)    Disparages the real estate, goods, services, property or business of a customer or another by false or misleading representations of fact.

Or. Rev. Stat. 646.606(1).

Although it does not appear that the Oregon courts have addressed the question, the courts of this district have persuasively interpreted the legislative history of the UTPA as providing a cause of action only to consumers, and not to business rivals. *See, e.g., Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, 22 F. Supp. 3d. 1126, 1135-1137 (D. Or. 2014) (and cases discussed therein). Defendants argue that CCI is not a consumer but rather a provider of services to consumers, and on that basis argue that CCI cannot establish a probability of success on the merits of its UTPA claim.

Page 19 - FINDINGS AND RECOMMENDATION

I agree with the defendants that the legislative history of the UTPA leaves little room for the conclusion that a non-consumer may bring a private cause of action under the statute. *See Denson v. Ron Tonkin Gran Turismo, Inc.*, 279 Or. 85, 90  (1977) (discussing the legislative history of the UTPA and concluding that it was not intended to protect competitors but rather to protect only consumers); *Lund v. Arbonne Int'l, Inc.*, 132 Ore. App. 87, 93 n.7, 887 P.2d 817, 822 n.7 (1994) (discussing legislative history of the UTPA indicating that victims of unlawful trade practices other than consumers are "excluded" from the protections of the statute); *see also CollegeNET, Inc. v. Embark.com, Inc.*, 230 F. Supp. 2d 1167, 1173-1175 (D. Or. 2000) (discussing legislative history).  However, it is by no means clear that CCI is not, as defendants contend, a consumer for purposes of the statute.  I note in this connection that a corporate entity can constitute a "person that suffers an ascertainable loss of money or property" for purposes of Section 646.638(1), *see* Or. Rev. Stat. § 646.605(4), such that there can be no argument that CCI is barred from bringing a UTPA claim on sole the basis of its status as a corporate entity engaged in business. *See, e.g., Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 129 Or. App. 206, 217 (1994).

Furthermore, CCI is in no sense a competitor or a business rival of defendants.  As discussed above, CCI is a mobile virtual network operator in the business of providing cellphone services; defendants own and operate a consumer review website.  CCI's revenue comes from consumers who purchase their cellphone services, whereas defendants earn revenue from two different classes of consumers:  purchasers of advertising space on defendants' website, and purchasers of memberships in defendants' accreditation program.

Moreover, as discussed above CCI expressly alleges that defendants repeatedly and

Page 20 - FINDINGS AND RECOMMENDATION

persistently solicited CCI to become a purchaser of the services defendants offer to their

accredited members, namely rating-improvement services.  Defendants' alleged solicitations

establish for purposes of this stage of these proceedings that CCI was squarely within the class of

potential consumers of defendants' membership services.

Finally, it is clear that the Oregon courts do not require that a UTPA plaintiff have

actually purchased the defendant's products or services or otherwise have entered into privity

with the defendant, but rather require only that the plaintiff be a consumer damaged by the

defendant's unlawful conduct.  *See, e.g., Raudebaugh v. Action Pest Control, Inc.*, 59 Ore. App.

166, 171-172 (1982) (finding that plaintiffs who were harmed by a business entity's

misrepresentations had statutory standing to bring a UTPA claim despite not having purchased

any products or services from the defendant and despite the fact that the defendant had no

knowledge that its misrepresentations would be communicated to the plaintiffs at the time they

were made).  As a potential consumer of defendants' services allegedly harmed by defendants'

complained-of unlawful conduct, under Oregon law the requirement that a UTPA plaintiff be a

"consumer" rather than a business rival presents no bar to CCI's UTPA claim.

For its part, CCI has adduced evidence on the basis of which, if viewed in the light most

favorable to CCI, a finder of fact could reasonably conclude that defendants manipulated the

consumer reviews hosted on its page in a manner calculated to create a more negative impression

of CCI's services than would have been the case had the reviews been unmanipulated.  *See*

Declaration of Robert B. Lowry ("Lowry Decl.") (and exhibits attached thereto); Declaration of

John S. Marick ("Marick Decl.") (and exhibits attached thereto); Declaration of Nancy S. Koppy

("Koppy Decl.") (and exhibits attached thereto).  In addition, CCI has adduced evidence on the

Page 21 - FINDINGS AND RECOMMENDATION

basis of which, if viewed in the light most favorable to CCI, a finder of fact could reasonably

conclude that CCI suffered ascertainable losses as a consequence of such manipulations. *See*

Marick Decl., ¶ 9 (and associated exhibits attached thereto). I therefore find that CCI has met its

burden to establish a probability of success on the merits of its UTPA claim. Defendants' special

motion to strike should therefore be denied as to that claim.

> ### 2. CCI's Burden to Establish a Probability of Success on the Merits as to its Intentional Interference Claim

As noted above, under Oregon law:

> To state a claim for intentional interference with economic relations, a plaintiff
> must allege: (1) the existence of a professional or business relationship;
> (2) intentional interference with that relationship; (3) by a third party;
> (4) accomplished through improper means or for an improper purpose; (5) a
> causal effect between the interference and damage to the economic relations; and
> (6) damages.

*Northwest Natural Gas*, 328 Or. at 498, *citing McGanty*, 321 Or. at 535. The requisite

"professional or business relationship" may be purely prospective in nature. *See Cron*, 255 Or.

App. at 125, *quoting McGanty v. Staudenraus*, 321 Or. 532, 535 (1995). "Generally, commercial

and contractual relationships enjoy the protection of the tort." *Id.*, *citing Allen v. Hall*, 328 Or.

276, 281 (1999). "However, a defendant can be liable for interference 'even though the

arrangement interfered with does not rise to the dignity of a contract.'" *Id.*, *quoting Luisi*, 252 Or.

at 275. "Liability for intentional interference with prospective business advantage. . . arises when

the defendant, without a privilege to do so, induces a third person not to enter into or to continue

a business relationship with the plaintiff." *Thompson*, 130 Or. App. at 313; *citing Top Service*,

283 Or. at 206.

Moreover, "[d]eliberate interference alone does not give rise to tort liability." *Cron*, 255

Page 22 - FINDINGS AND RECOMMENDATION

Or. App. at 125; *see also Top Service*, 283 Or. at 209-210 ("[A] claim [of tort liability for intentional interference with contractual or other economic relations] is made out when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.").

> The *Northwest Natural Gas* court specified that:
>
> To be entitled to reach a jury, a plaintiff must not only prove that defendant intentionally interfered with [its] business relationship but also that defendant had a duty of non-interference; *i.e.*, that [it] interfered for an improper purpose rather than for a legitimate one, or that [it] used improper means which resulted in injury to plaintiff. Therefore, a case is made out which entitles plaintiff to go to a jury only when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself.

*Northwest Natural Gas*, 328 Or. at 498 (citations, internal quotation marks omitted).

It is defendants' position that CCI cannot establish a probability of prevailing on the merits of its intentional interference claim because it had no existing contractual relationship or any non-speculative prospective economic relationship with members of the public who viewed reviews of CCI's services on defendants' website, and because, in the absence of any such existing or affirmatively prospective relationship, it cannot show that defendants' purported interference with such relationships could have been intentional. CCI counters that its prospective business relationships with members of the public affirmatively seeking out reviews of its services were more than merely speculative and at all material times were known by defendants, in part because as a matter of logic either all or nearly all such persons can be expected to have been affirmatively considering entering into a business relationship with CCI at

Page 23 - FINDINGS AND RECOMMENDATION

the time they visited defendants' website, and in part because of evidence tending to establish that

a small but determinable percentage of persons who seek out information regarding CCI's

services can be predicted as a matter of statistics to make the ultimate decision to do business

with CCI.

The Oregon case law does not provide significant guidance as to what sorts of

"arrangements" between parties that do not "rise to the dignity of a contract" can constitute a

prospective economic relationship for purposes of the tort. While it is well settled that the

requisite "professional or business relationship [may constitute], *e.g.*, . . . a prospective economic

advantage," *McGanty*, 321 Or. at 535, the cases do not establish guidelines for distinguishing

purely speculative potential economic relations with member of the public generally from

cognizable prospective relationships that can be identified with adequate certainty

notwithstanding the absence of any enforceable business agreement, but rather establish only that

interference with a potential economic advantage may be actionable where the defendant

"know[s] of the plaintiff's prospective relationship and intentionally interfere[s] with that

relationship" via improper means or purpose, to the plaintiff's ascertainable harm. *United*

*Employer Benefit Corp. v. Department of Ins. & Fin.*, 133 Or. App. 477, 487 (1995), *citing*

*Glubka v. Long*, 115 Or. App. 236, 239 (1992). In *United Employer*, the court of appeals

affirmed the decision of the trial court below to direct verdict in favor of an intentional

interference defendant on the ground that the defendant's interference was accomplished neither

through improper means nor for any improper purpose, but apparently considered the other

elements of the tort to have been satisfied by evidence that the defendant had knowledge of the

plaintiff's intent to solicit potential customers whose names appeared on a list, a substantial

proportion of whom had had no prior contact with the plaintiff, that despite such knowledge the defendant intentionally interfered with the plaintiff's ability to solicit the customers, and that the plaintiff was damaged in its business in consequence. *See id.* at 484, 487. It thus appears that, under Oregon law, a third party's conduct in intentionally inducing a person not to enter into a business relationship with another may be actionable where the prospect that the possible business relationship would be consummated was sufficiently cognizable that the third party could be aware that such prospect existed. *See id.*; *see also Top Service*, 283 Or. at 206.

The record herein contains evidence on the basis of which a finder of fact could reasonably conclude that such a prospect of economic relations between CCI and persons searching for reviews of CCI's services existed, and that defendants were aware of it at the material times. Specifically, the record contains both Marick's declaration testimony that an ascertainable percentage of members of the public who choose to access CCI's website ultimately elect to do business with CCI, *see* Marick Decl., ¶ 9, and evidence that defendants, by and through their employee Polacek, admitted to CCI that they were able to ascertain as a matter of statistics both the percentage of persons affirmatively searching for consumer reviews of CCI's services who ultimately elected to do business with CCI and the expected increase in that percentage should CCI become an accredited member of ConsumerAffairs, *see* Declaration of Brian E. Hepner ("Hepner Decl.") (and exhibits attached thereto), Marick Decl., Exh. 1. In addition, as noted above, CCI has adduced evidence on the basis of which a finder of fact could reasonably conclude that defendants intentionally and improperly manipulated the consumer reviews hosted on its page in a manner calculated to create a more negative impression of CCI's services than would have been the case had the reviews been unmanipulated, *see* Lowry Decl.

Page 25 - FINDINGS AND RECOMMENDATION

(and exhibits attached thereto), Marick Decl. (and exhibits attached thereto), Koppy Decl. (and

exhibits attached thereto), as well as evidence on the basis of which a finder of fact could

reasonably conclude that CCI suffered ascertainable losses as a consequence of such

manipulations, *see* Marick Decl., ¶ 9 (and associated exhibits attached thereto). On the basis of

that evidence, I find that CCI has met its burden to establish a probability of success on the

merits of its intentional interference claim. Defendants' special motion to strike should therefore

be denied as to that claim.

### 3. CCI's Burden to Establish a Probability of Success on the Merits as to its Defamation Claim

As noted above, under Oregon law, "[t]he elements of a claim for defamation are: (1) the

making of a defamatory statement; (2) publication of the defamatory material; and (3) a resulting

special harm, unless the statement is defamatory *per se* and therefore gives rise to presumptive

special harm." *Nat'l Union*, 220 Or. App. at 584, *citing L & D*, 171 Or. App. at 22. "A

defamatory statement is one that would subject another to hatred, contempt or ridicule or tend to

diminish the esteem, respect, goodwill or confidence in which the other is held or to excite

adverse, derogatory or unpleasant feelings or opinions against the other." *Id.* (internal

modifications omitted), *quoting Marleau*, 333 Or. at 94. Defendants take the position that CCI

cannot establish a probability of success on the merits of its defamation claims because the

statements regarding CCI's services that appear on its website are statements of opinion, and as a

matter of law statements of opinion cannot be defamatory. Defendants additionally argue that

any defamatory statements made in the consumer reviews published on its website are

attributable solely to the authors of the reviews pursuant to the federal Communications Decency

Act, and cannot be actionable against the defendants.

I agree with defendants that, as a general rule, "expressions of opinion. . . which cannot be interpreted reasonably as stating actual facts, are not actionable [as defamation] because they are constitutionally protected." *Reesman v. Highfill*, 327 Or. 597, 606 (1998), *citing Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). Here, however, CCI's defamation claim is not premised on the opinions expressed by the consumers whose reviews are hosted on defendants' webpages, but rather on defendants' own affirmative statements, primarily – perhaps exclusively – defendants' statements regarding the aggregate"overall satisfaction rating" that it calculates on the basis of all of the reviews of CCI's services hosted on its site, and presents in salient fashion on the same page as the reviews themselves. It is CCI's position that defendants' own statement that the "overall satisfaction rating" of CCI's services was (for example) 1.5 out of a possible 5 stars was defamatory; specifically, it is CCI's position that defendants made and published the statement, that the statement tended to diminish the confidence of the public in the quality of CCI's services, that it was damaged in its business by the defamatory character of the statement, and that defendants knew the statement was false when they published it, in that defendants knowingly failed to include positive reviews in their calculation of the rating. CCI has proffered evidence from which a finder of fact could reasonably conclude that each of those propositions is accurate. *See* Lowry Decl. (and exhibits attached thereto); Marick Decl. (and exhibits attached thereto); Koppy Decl. (and exhibits attached thereto); Hepner Decl. (and exhibits attached thereto).

Moreover, because the statement(s) actually at issue are not those of third parties to this action that are merely hosted and curated by the defendants but rather the defendants' own factual

Page 27 - FINDINGS AND RECOMMENDATION

representation(s) regarding those third-party expressions of opinion, the immunity provision of

the Communications Decency Act, which provides only that "[n]o provider or user of an

interactive computer service shall be treated as the publisher or speaker of any information

provided by another information content provider," is entirely inapplicable to CCI's defamation

claim to the extent so premised.  47 U.S.C. § 230(c)(1).

     For the foregoing reasons, CCI has met its burden to establish a probability of success on

the merits of its defamation claim.  Defendants' special motion to strike should therefore be

denied as to that claim.

          **4.**      **CCI's Burden to Establish a Probability of Success on the Merits as to its State-Law Claims to the Extent Alleged against Carman**

     Defendants argue, in the alternative to their arguments in favor of striking all of CCI's

state-law claims in their entirety, that CCI's state-law claims should be stricken to the extent

alleged against Carman, the principal of both corporate defendants.  In support of that argument,

defendants assert that CCI failed to allege Carman's direct involvement in any of the complained-

of conduct.

     Notwithstanding defendants' assertion, CCI in fact alleged that Carman "established a

new business model" for the ConsumerAffairs business, specifically the business model

complained of herein pursuant to which defendants allegedly manipulate the presentation of

consumer reviews and suppress positive reviews in order to create a less favorable than

warranted impression of the products and services of entities that decline to become accredited

members of defendants' scheme.  Complaint, ¶¶ 3, 11.  More critically, CCI has adduced

evidence on the basis of which a finder of fact could reasonably conclude that Carman directed

the corporate entities to engage in the allegedly tortious conduct described in CCI's complaint. *See* Declaration of Mike Strain ("Strain Decl."), Exh. 1. Under Oregon law, an officer or director of a corporate entity will be liable for tortious conduct the officer or director affirmatively directs the corporate entity to engage in. *See Cortez v. Nacco Material Handling Group, Inc.*, 356 Or. 254, 270 (2014); *see also Lewis v. Devils Lake Rock Crushing Co.*, 274 Or. 293, 298 (1976); *Pelton v. Gold Hill Canal Co.*, 72 Or. 353, 357-358 (1914). It follows that CCI has met its burden to establish a probability of success on the merits of its state-law claims to the extent alleged against Carman, and that defendants' special motion to strike should be denied to the extent it addresses CCI's claims as alleged against Carman specifically.[6]

## II.     Defendants' Constructive Motion to Dismiss CCI's RICO Claim

As noted above – and as defendants concede by and through their reply memorandum – CCI's federal RICO claim is necessarily outside the scope of defendants' special motion to strike. Also as noted above, it is appropriate (where, as here, the nonmoving party has had an opportunity to submit briefing defending the adequacy of its allegations to support the federal claim) to treat a special motion to strike a federal claim as a motion to dismiss arising under Federal Civil Procedure Rule 12(b). *See Seismic Reservoir*, 785 F.3d at 335-336; *LaHodny*, 2015

---

[6] Moreover, assuming *arguendo* that CCI's evidentiary proffer in support of its state-law claims to the extent alleged against Carman were insufficient to meet its burden at the second step of the two-step process, because evidence of Carman's direct involvement in or affirmative direction of the tortious conduct complained of in CCI's complaint would, assuming such evidence exists, necessarily be within defendants' possession and control, it would be inappropriate under *Metabolife, supra*, to grant defendants' special motion to strike as to any of the state-law claims to the extent alleged against Carman without first giving CCI the opportunity to conduct relevant discovery. *See Metabolife*, 264 F.3d at 846-847. On that *arguendo* assumption, therefore, defendants' special motion to strike as to CCI's state-law claims to the extent alleged against Carman would most appropriately be treated as a motion for summary judgment under Federal Civil Procedure Rule 56.

Page 29 - FINDINGS AND RECOMMENDATION

U.S. Dist. LEXIS 38447 at *14.

The federal RICO Act provides a civil action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). 18 U.S.C. § 1962(a) through (c) "prohibit certain 'patterns of racketeering activity' in relation to an 'enterprise.'" *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't*, 770 F.3d 834, 837 (9th Cir. 2014) (internal modifications omitted), *quoting* 18 U.S.C. § 1962. The conduct constituting "racketeering activity" for purposes of Section 1962 – generally referred to as conduct constituting a "predicate act" for purposes of a RICO claim – is set forth in full at 18 U.S.C. § 1961, particularly Section 1961(1). *See* 18 U.S.C. § 1961. Here, as noted above, CCI alleges that defendants' complained-of conduct constitutes predicate acts of wire fraud and of extortion.

Defendants argue, first,[7] that CCI's RICO claim is inadequately pled in that CCI has not alleged each defendant's specific involvement in conducting or directing the affairs of the alleged RICO enterprise. Defendants are correct that civil RICO liability is limited to persons or entities who play "*some* part in directing the enterprise's affairs," *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis original), but it is likewise true that a RICO defendant need not have "*significant control* over or within [the] enterprise" for RICO liability to attach, *id.* at 179 n. 4. The courts of the Ninth Circuit have found the following factors relevant to determining whether the *Reves* standard for control over or direction of the enterprise has been satisfied: (1) whether the defendant "occup[ied] a position in the chain of command . . . through which the affairs of

---

[7] For purposes of determining the merits of defendants' constructive motion to dismiss CCI's RICO claim, I disregard defendants' arguments that necessarily pertain only to its arguments in favor of striking the RICO claim under Oregon's anti-SLAPP statute.

Page 30 - FINDINGS AND RECOMMENDATION

the enterprise [were] conducted,"(2) whether the defendant "knowingly implement[ed] decisions of upper management," and (3) whether the defendant's "participation was vital to the mission's success." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (citations, internal quotation marks omitted).

Here, CCI has alleged that all three defendants, "and each of them," directed the corporate defendants' agents to engage in complained-of conduct, including Polacek's email messages to CCI's employees and officers and the maintenance of a collection of consumer reviews hosted by a purportedly unbiased consumer advocacy organization that in reality presents an unwarrantedly positive impression of defendants' paying customers and an unwarrantedly negative impression of entities who refuse to become paying customers of the defendants. *See* Complaint, ¶¶ 34-38. Defendant argues that such allegations constitute improper "group pleading," but in fact a fair reading of the allegations is that each defendant directed the corporate defendants' agents to engage in the complained-of conduct (thus necessarily occupying positions in the chain of command of the enterprise), which is sufficient to satisfy the *Reves* standard. If defendants take issue with the accuracy of those allegations, the proper mechanism for challenging the factual basis of CCI's position that each defendant played a part in directing the alleged enterprise is a motion for summary judgment. Defendants' specific-involvement argument provides no grounds for dismissing CCI's RICO claim at this pleading stage of these proceedings.

Second, defendants argue that CCI has not adequately alleged a "pattern" of racketeering activity. Specifically, defendants argue that CCI has alleged, at most, a single scheme to induce CCI to become one of defendants' accredited members, which defendants assert is insufficient to satisfy the pattern requirement.

Page 31 - FINDINGS AND RECOMMENDATION

The courts of the Ninth Circuit require a "threat of continuing activity" in order to find a "pattern" of racketeering activity. *Medallion Television Enters. v. SelecTV of Cal.*, 833 F.2d 1360, 1363 (9th Cir. 1987). "Continuity does not require a showing that the defendants engaged in more than one 'scheme' or 'criminal episode.' . . . The circumstances of the case, however, must suggest that the predicate acts are indicative of a threat of continuing activity." *Id.* (citations omitted). Here, CCI has alleged just such a threat of continuing activity, in that, according to CCI's allegations, defendants continue to suppress positive reviews of CCI's services, continue to hold out their organization as one dedicated to unbiased consumer advocacy, and continue to offer relief from their improper manipulation of third-party consumer reviews to reviewed entities that pay significant sums of money to become accredited members. This alleged continuing activity is sufficient to satisfy the pattern requirement. Moreover, CCI has in any event alleged both several instances of efforts to use the threat of economic harm to CCI's business to extort payments from CCI and the deception of the public at large, effected via the internet, regarding the unbiased nature of the third-party reviews hosted on defendants' webpage. Those allegations support the inference that defendants engaged in at least two predicate acts of racketeering (multiple attempts to commit extortion and at least one act of wire fraud). Defendants' pattern argument thus provides no grounds for dismissing CCI's RICO claim at this pleading stage of these proceedings.

Third, defendants argue that CCI has not successfully alleged any predicate acts of wire fraud. In support of that argument, defendants assert both that CCI has failed to allege wire fraud with sufficient particularity to satisfy the heightened pleading standard of Federal Civil Procedure Rule 9(b) and that CCI has failed to allege that it suffered harm directly caused by

Page 32 - FINDINGS AND RECOMMENDATION

alleged wire fraud.

To address defendants' arguments, it is necessary first to differentiate between the wire fraud actionable under the RICO statute and common-law fraud under Oregon law. It is well established that "state law is irrelevant in determining whether a certain course of conduct is violative of the wire fraud statute" for RICO purposes. *United States v. Louderman*, 576 F.2d 1383, 1387 (9th Cir. 1978). The wire fraud statute, by contrast with common-law fraud, makes unlawful "*any scheme or artifice* to defraud, or *for obtaining money or property by means of false or fraudulent pretenses, representations, or promises*" where the person who devised or intended to devise such scheme "transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343 (emphasis supplied). Moreover, "[t]he fraudulent nature of the 'scheme or artifice to defraud' is measured by a non-technical standard." *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980), *citing Louderman*, 576 F.2d at 1389. "Thus, schemes are condemned which are contrary to public policy or which fail to measure up to the 'reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Id.*, *quoting Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958). As such:

> The common-law requirements of "justifiable reliance" and "damages," for example, plainly have no place in the federal [wire, mail, and bank] fraud statutes. *See, e.g., United States v. Stewart*, 872 F.2d 957, 960 (CA10 1989) ("Under the mail fraud statute, the government does not have to prove actual reliance upon the defendant's misrepresentations"); *United States v. Rowe*, 56 F.2d 747, 749 (CA2) (L. Hand, J.) ("Civilly of course the mail fraud statute would fail without proof of damage, but that has no application to criminal liability"), *cert. denied*, 286 U.S. 554, 76 L. Ed. 1289, 52 S. Ct. 579 (1932). By prohibiting the "scheme to defraud," rather than the completed fraud, the elements of reliance and damage

Page 33 - FINDINGS AND RECOMMENDATION

would clearly be inconsistent with the statutes Congress enacted.

*Neder v. United States*, 527 U.S. 1, 24-25 (1999) (internal modifications omitted); *see also*

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657-659 (2008) (noting that the common

law recognizes a cause of action against persons who defraud other persons for the purpose of

causing monetary harm to third parties; further noting that while reliance may sometimes be

invoked in order to prove the element of causation, it is not thereby incorporated as an element of

federal fraud).

CCI has alleged that defendants maintain a website which purports to host consumer

reviews of CCI's products without regard to whether such reviews may be characterizable as

reviews or complaints, but which in fact does not include all positive reviews of entities which

refuse to become defendants' accredited members. Specifically, CCI has alleged that defendants

have maintained that website at all material times up to and including the present. CCI has

alleged that the website is specifically hosted by ConsumerAffairs, that Carman is

ConsumerAffairs' principal, that Consumers Unified is the entity by and through which

accredited members contract with defendants, and that Carman is Consumers Unified's principal.

It is CCI's position that this arrangement constitutes a scheme to deceive the public through the

use of the wires for the purpose of causing CCI to suffer pecuniary harm. If the truth of CCI's

allegations were established, that scheme would constitute wire fraud under Section 1343, and its

elements have been alleged with particularity. Defendants' Rule 9(b) argument thus provides no

grounds for dismissing CCI's RICO claim at this stage of these proceedings. Moreover, CCI has

alleged ascertainable pecuniary harm directly caused by defendants' alleged deception of

members of the public seeking reviews of CCI's services. *See* Complaint, ¶ 24. Defendants'

direct-damage argument thus likewise provides no grounds for dismissal of CCI's RICO claim.

Fourth and finally, defendants argue that CCI has not successfully alleged any predicate acts of extortion. In support of that argument, defendants assert that CCI has alleged only that defendants advised CCI of the likelihood that it would suffer loss if it did not avail itself of defendants' legitimately beneficial services, and not that defendants improperly threatened to harm CCI's business in order to obtain wrongful payments from it.

For RICO purposes, the predicate act of extortion can be defined under state law, so long as the state law provides for the possibility of punishment by imprisonment for more than one year. *See* 18 U.S.C. § 1961(1)(A). Oregon's extortion statute, Or. Rev. Stat. § 164.075, defined extortion as a Class B felony, *see* Or. Rev. Stat. § 164.075(2), and as such is punishable by up to ten years of imprisonment, *see* Or. Rev. Stat. § 161.605. Violation of Oregon's extortion statute can therefore constitute a predicate offense for RICO purposes. *See* 18 U.S.C. § 1961(1)(A). Under Oregon's statute:

> A person commits theft by extortion when the person compels or induces another to deliver property to the person or to a third person by instilling in the other a fear that, if the property is not so delivered, the actor or a third person will in the future:
>
> * * *
>
> (b)    Cause damage to property;
>
> (c)    Engage in other conduct constituting a crime;
>
> * * *
>
> (e)    Expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule;
>
> * * *; or

Page 35 - FINDINGS AND RECOMMENDATION

(i)       Inflict any other harm that would not benefit the actor.

Or. Rev. Stat. § 164.075(1).

I agree with the defendants that, under Oregon's statutory scheme, it is not extortion for a person to "threaten" only to withhold a benefit from another who lacks any right to that benefit, and where it is not independently wrongful for the benefit to be withheld. However, contrary to defendants' argument, CCI does not allege that defendants "threatened" only to withhold a beneficial service to which CCI had no pre-existing right, but rather that defendants, in addition to not permitting CCI to respond to or challenge negative reviews or to benefit from more favorable presentation of legitimately submitted third-party reviews, also affirmatively suppressed positive reviews without informing users of its webpage that it had done so, and indicated that it would continue doing so unless CCI became an accredited member. It is thus CCI's position that defendants attempted to extort tens of thousands of dollars in accredited membership fees from CCI under threat of improper harm to its reputation and to its business. As such, CCI has adequately alleged the predicate act of extortion, and defendants' final argument provides no grounds for dismissal of CCI's RICO claim.

In the absence of any grounds for dismissal of CCI's RICO claim, defendants' constructive motion to dismiss should be denied.

## CONCLUSION

For the reasons set forth above, defendants' special motion (#9) to strike should be denied in its entirety, both *qua* special motion to strike and *qua* constructive motion to dismiss.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any,

Page 36 - FINDINGS AND RECOMMENDATION

are due fourteen (14) days from service of the Findings and Recommendation.  If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will go under advisement.


Dated this 29th day of February, 2016.

Honorable Paul Papak
United States Magistrate Judge